**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-02640-REB

WYERS PRODUCTS GROUP, INC. a Colorado corporation, and
PHILIP W. WYERS,

    Plaintiffs,

v.

CEQUENT PERFORMANCE PRODUCTS, INC.,

    Defendant.

**PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF**

Plaintiffs Philip W. Wyers and Wyers Products Group, Inc. ("Wyers"), by and through its attorneys, LATHROP & GAGE, LLP, respectfully submit the following Opening Claim Construction Brief.

### I.  INTRODUCTORY STATEMENT

The present matter involves claims of patent infringement regarding two United States Patents issued to Phillip Wyers under which Wyers Products has the sole and exclusive rights to manufacture and sell commercial embodiments. Wyers asserts infringement of two patents in this case: United States Patent 6,672,115 ("the '115 Patent") and United States Patent 7,121,121 ("the '121 Patent"). The '115 Patent and the '121 Patent are attached hereto as **Exhibit 1** and **Exhibit 2**, respectively.

Wyers asserts Claims 23 and 27 of the '115 Patent. Claim 23[1] describes a locking hitch system to be used in towing loads of various sizes and weights. Claim 23 is unique in the context of the '115 Patent in that it is limited to a <u>hitch system</u>, i.e., vehicle towing applications. Thus, the language of claim 23 reflects a singular focus on this application of the locking system. Concomitant with the limitation of claim 23 to vehicular towing applications come certain load-bearing requirements of the towing industry. Claim 27 narrowly describes the locking hitch pin component of such a towing system. Wyers' proposed construction of the identified terms of claim 23 align the claim language with the ordinary and customary understanding of such language by an ordinarily skilled artisan in 2000, when the application for the '115 Patent was filed.

Different from the load bearing and load sustaining structures described in claims 23 and 27 of the '115 patent, the towing lock accessory described in claim 5 of the '121 Patent[2] covers devices used to secure trailers and other towing devices when they are stationary and decoupled from a hitch bar. Wyers submits that the meaning of the terms of claim 5 of the '121 Patent are clear on their face, and Cequent's proposed constructions function only to import new limitations into the claim, without support.

---

[1] The universal towing system described in Claims 23 and 27 was not at issue in *Wyers v. Master Lock, Inc.* and were therefore not the subject of the Federal Circuit's opinion issued on July 20, 2010 invalidating certain claims of the '115 Patent.

[2] Wyers has withdrawn its preliminary infringement contention with respect to claim 7 of the '121 Patent. On November 7, 2013, Wyers served its First Supplemental Infringement Contentions on Cequent, wherein claim 7 of the '121 Patent was withdrawn. Accordingly, the claim terms of the '121 Patent to be construed in the *Markman* proceedings in this case are limited to those identified by the parties as to claim 5. *See* Joint Claim Construction Statement [#69].

## II. LAW OF CLAIM CONSTRUCTION

A patent infringement analysis involves two steps. *Cordis Corp. v. Boston Scientific Corp.*, 658 F. 3d 1347, 1354 (Fed. Cir. 2011); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*). First, the court must determine the meaning and scope of the patent claims. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). Second, the fact finder must then compare the accused device or method to the properly construed claims to determine whether the device infringes. *Cordis Corp.,* 658 F. 3d at 1354; *Cybor Corp.*, 138 F.3d at 1454. This memorandum discusses only the first analysis of claim construction for the '115 and '121 patents.

The court performs claim construction as a question of law. *Markman,* 517 U.S. at 372 (holding that "the construction of a patent, including terms of art within its claims, is exclusively within the province of the court"). In construing claims, the court should arrive at a "fixed, unambiguous, legally operative meaning to the claim" for eventual comparison to the accused devices to resolve the question of infringement. *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004). "[T]he claims of a patent define the invention to which the patentee is entitled to the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).

The words of a patent claim "are generally given their ordinary and customary meaning." *Id.* Claim construction thus "begins with the language of the claims." *Research Plastics, Inc. v. Federal Packaging, Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005). The "ordinary and customary meaning" of a claim term "is the meaning that the

term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. The person of ordinary skill in the art is deemed to read the claim term in the context of both the particular claim in which the disputed terms appears and the entire patent. *Id.*

According appropriate weight to such context within which the claim term appears requires giving effect to *all* the terms in the claim:

> Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration. For that reason, claims are interpreted with an eye toward giving effect to all terms in the claim.

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 951 (Fed. Cir. 2006) (rejecting proposed claim construction that would treat claim terms as meaningless); *see also Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330-31 (Fed. Cir. 2008) (affirming lower court's rejection of proposed construction that renders a claim term superfluous and "ascribes no meaning to the term").

Where the ordinary and customary meaning of a claim term is not apparent from the claim term itself, the term's meaning may be divined from other sources. Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314. Extrinsic evidence used in claim construction includes expert and inventor testimony,

dictionaries, and learned treatises. *Id.* at 1317. A court may consult a dictionary to arrive at the ordinary and customary definition if the intrinsic evidence (e.g., the claim language, specification, and file history) does not contradict those definitions. *Id.* at 1324. Expert testimony may prove useful "for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318. Similarly, inventor testimony regarding the meaning of claim terms is helpful so long as the "testimony of the inventors is consistent with the guidance provided by the patent itself." *Kolmes v. World Elastic Corp.*, 1998 WL 255064, *4 (Fed. Cir. May 6, 1998).

In claim construction, limitations from the preferred embodiments are not to be read into the claims. *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007). Rather, the language of each claim presumptively defines a distinct invention. *Id.* The patent specification "often describes very specific embodiments of the invention," but the Federal Circuit has "repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323. The rationale behind this bedrock principle is straightforward: "That preferred embodiment cannot be the only product covered by the claims; if it were, the claims themselves would be unnecessary." *Acumed*, 483 F.3d at 809. This cardinal rule applies without regard to the number of embodiments described in the patent specification. Thus, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless

the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

### III. CONSTRUCTION OF DISPUTED CLAIM TERMS

Wyers asserts that Cequent infringes claims 23 and 27 of the '115 Patent and claim 5 of the '121 Patent. The terms proposed for construction including, Wyers' proposed constructions, and Cequent's competing proposed constructions are set forth in tables below. Wyers further summarizes the support for its proposed constructions below, and expects to proffer the expert/inventor testimony of Mr. Wyers at the *Markman* hearing in this matter to provide the Court with further detail on these points.

#### A. THE '115 PATENT

##### 1. Claim Terms Identified by Wyers for Construction (Claim 23)

The following chart identifies the terms of claim 23 of the '115 Patent on which Wyers requests construction, along with Wyers' proposed constructions and Cequent's competing proposed constructions:

**Claim 23 of '115 Patent**
*(terms identified for construction by Wyers)*

| Claim Term | Wyers' Proposed Construction | Cequent's Proposed Construction[3] |
|---|---|---|

---

[3] In arguing against Wyers, has proposed for construction in Claim 23, Cequent incorrectly states "[n]o construction necessary, as Wyers confirmed by not seeking a construction of these terms in the *Master Lock* case." Not only was claim 23 not at issue in *Master Lock*, but Cequent is mistaken on the facts: There was not a *Markman* phase in the *Master Lock* case. Rather, Master Lock acknowledged infringement very early in that case and ultimately stipulated to infringement at trial. The parties stipulated to a few constructions to help the jury at a later time in the case, but nothing was contested.

| *Claim Term* | *Wyers' Proposed Construction* | *Cequent's Proposed Construction*[3] |
|---|---|---|
| "first hitch bar and a first hitch receiver" (Claim 23) | "Class II hitch bar and a Class II hitch receiver capable of towing at least 5000 lbs when properly assembled" | No construction necessary, as Wyers confirmed by not seeking a construction of these terms in the *Master Lock* case, or, in the alternative, "the openings on the first bar and first receiver are lined up" |
| "first apertures of a first size" (Claim 23) | "holes in the Class II hitch bar and Class II hitch receiver having approximately a ½ inch diameter" | No construction necessary, as Wyers confirmed by not seeking a construction of these terms in the *Master Lock* case, or, in the alternative, "openings on the first bar and first receiver having a specific size" |
| "aligned for registration" (Claim 23) | "when the Class II hitch bar is inserted into the Class II hitch receiver, the first apertures register to allow insertion of the shank of the convertible hitch pin" | No construction necessary, as Wyers confirmed by not seeking a construction of these terms in the *Master Lock* case, or, in the alternative, "the openings on the first bar and first receiver are lined up" |
| "second hitch bar and second hitch receiver" (Claim 23) | "Class III/IV hitch bar and Class III/IV hitch receiver capable of towing at least 10,000 lbs when assembled" | No construction necessary, as Wyers confirmed by not seeking a construction of these terms in the *Master Lock* case, or, in the alternative, "a second bar and a second receiver that couple a second motor vehicle to a device, where the first motor vehicle is different from the second motor vehicle" |
| "second apertures of a first size" (Claim 23) | "holes in the Class III/IV hitch bar and Class III/IV hitch receiver having approximately a ⅝ inch diameter" | No construction necessary, as Wyers confirmed by not seeking a construction of these terms in the *Master Lock* case, or, in the alternative, "openings on the second bar and second receiver having a specific size" |
| "shank having first and second ends" (Claim 23) | "the portion of the locking pin that sits between the end portion and the locking head" | No construction necessary, as Wyers confirmed by not seeking a construction of these terms in the *Master Lock* case, or, in the alternative, "a portion of the hitch pin between the stop member and the locking head when engaged" |

| *Claim Term* | *Wyers' Proposed Construction* | *Cequent's Proposed Construction*[3] |
|---|---|---|
| "outer dimension sized and adapted for close-fitted engagement with the first apertures" (Claim 23) | "outer diameter of the shank is manufactured to engage (through close proximity) the apertures of the Class II hitch bar and Class II hitch receiver for purposes of completing the system that tows at least 5000 lbs and sheer load of at least 15,000 lbs" | No construction necessary, as Wyers confirmed by not seeking a construction of these terms in the *Master Lock* case, or, in the alternative, "an outer dimension of the shank is a little less than the openings" |
| "selective engagement with said hitch pin shank" (Claim 23) | "a sleeve that engages the shank by having an interior diameter that closely approximates the exterior diameter of the shank for purposes of ensuring that the combined shank and sleeve can tow at least 10,000 lbs and sustains more than 25,000 lbs in sheer load" | No construction necessary, as Wyers confirmed by not seeking a construction of these terms in the *Master Lock* case, or, in the alternative, "the shank can be inserted into or removed from the sleeve" |
| "an outer dimension sized and adapted for close-fitted engagement with the second apertures" (Claim 23) | "outer diameter of the sleeve is manufactured to engage (through close proximity) the apertures of the Class III/IV hitch bar and Class III/IV hitch receiver for purposes of completing the system that tows 10,000 lbs and sustains more than 25,000 lbs of sheer load" | No construction necessary, as Wyers confirmed by not seeking a construction of these terms in the *Master Lock* case, or, in the alternative, "an outer dimension of the sleeve is a little less than the openings" |

### a. Claim 23 Describes a Towing System Subject to Industry Standards at the Time of Invention.

When reviewing the other claims and specification of the '115 Patent, it quickly becomes apparent that claim 23 narrowly describes an invention for a towing hitch system for use in vehicular towing. Specifically, the claim describes a "locking hitch system" comprised of components including first and second "hitch bars" and "hitch receivers" and a "hitch pin." The following figures provide visual context of this claimed towing system:



The limitation of claim 23 to towing hitches gives rise to ordinary and customary meanings of the claim terms identified by Wyers for construction that are not readily apparent from the terms themselves. Because the person of ordinary skill in the art at the time of invention would understand these claim terms to denote specific industry requirements, these claim terms should be construed by the Court. Wyers' proposed constructions elucidate the ordinary and customary meaning of the terms, and will aid the jury in understanding the invention and how it operates mechanically.

### b. *A person of ordinary skill in the art would understand the claim terms as Wyers has proposed.*

Mr. Wyers is both the inventor of the '115 Patent and a person having ordinary (or beyond) skill in the art of hitch lock systems (both presently and as of the time of the invention). As set forth in Mr. Wyers' Declaration, attached as **Exhibit 3** hereto, at the time of invention, the towing industry adopted specific towing classes—Class II and

Class III/IV. These industry standard classes translate to specific lock shank sizes and load bearing capacity requirements. Wyers Decl. ¶¶ 9-12. Namely, Class II towing uses ½" hitch pins, which must be capable of towing loads of 5,000 pounds, and withstanding sheer forces in excess of 15,000 pounds. *Id.* ¶ 9. Class III/IV towing uses ⅝" hitch pins, which must be capable of towing loads of 10,000 pounds, and withstanding sheer forces in excess of 25,000 pounds. *Id.* ¶ 11. These industry requirements for vehicular towing have been in place for over thirty years, and were well understood by any artisan of ordinary skill in the art as of 2000. *Id.* ¶ 13.

Wyers' proposed constructions of claim 23 take account of how the ordinary skilled artisan in the art of automotive locking designs would understand the terms—i.e., their ordinary and customary meaning. Mr. Wyers' Declaration is offered in support of such constructions, and his testimony will be proffered at the *Markman* hearing to further detail these topics. As discussed below, the intrinsic evidence of the '115 patent accords with Mr. Wyers' testimony and Wyers' proposed constructions.

### c. The specification of the '115 Patent supports Wyers' constructions.

Support for Wyers' constructions can be found in the specification of the '115 Patent in columns 2, 5, 7, 8 and 9, and most appropriately in figures 11 and 12. Specifically in column 2, ll. 22-23, in the Background of the Invention, the Patent states that "in the case of trailer hitch units and locks, there are a number of different size units available on the market depending on the size of the rig being towed." This phrase directly references load bearing locks because the hitch itself implies towing, which implies load bearing capabilities. The sizing of the rig implies whether or not the lock

can stand for larger sizes or larger load bearing amounts.  This is the purpose of the invention claimed in claim 23—to allow the trailer hitch to be a load bearing lock capable of towing at a certain capacity.  The reference to the load bearing capabilities of the lock is also present predominately in Figures 11 and 12, which illustrate two different tow bar and hitch receiver classes are coupled by use of a universal, size-adaptable hitch pin lock.

In particular, column 5, ll. 46-61, discloses that the "diameter dimension of the shank is sized to fit within the apertures of the two units to be interconnected."  The specification continues: "[i]n the prior art, these [diameter dimensions] typically have ranged from 3/8"-5/8", with the 5/8" and 1/2" sizes being the most popular."  *Id.*  Support for the specific diameters is displayed again in claim 1 of the Patent in column 9 ll. 15-19, "wherein said shank has an outer diameter of about 3/8", and wherein said size conversion structure includes a set of three sleeve elements each with a different outer diameter varying between 7/16" to 5/8"."  Looking to the language regarding the fit of the sleeve, column 7 ll. 64-67 and column 8 ll. 1-16 speak to the "close friction fit" where the "sleeve is necessarily sandwiched between the locking head the stop . . . to accomplish the retention of the sleeve over the shank."  This language in the specification is consistent with and provides support for Wyers' construction of the '115 Patent as it relates to the specific diameters of the hitch receiver as necessitated by the current marketplace, and the close-fitted engagement of the claimed hitch pin within such context.

These descriptions and comments in the specification of the '115 Patent support the construction of the claim terms asserted by Wyers as they relate to the load bearing capabilities of the hitch bars. Without this close fit between the sleeve and the shank the purpose of the lock is lost and the hitch bars are unable to bear the increased load, again the purpose of the invention is to enable the hitch bars to carry an increased load by application of the close fitting sleeve.

### d. The prosecution history of the '115 supports Wyers' constructions.

The prosecution history of the '115 Patent is attached hereto as **Exhibit 4.** In February of 2002 an Office Action was issued by the patent examiner on the '115 Patent application rejecting certain claims as obvious under 35 U.S.C. § 103(a) in light of three patents that allow for the possibility of nesting sleeves within one another. In response, Wyers filed an Amendment on February 21, 2002 where-in he provided an Abstract for the patent as well as amended language in order to clarify that "the sleeve is both moveably disposed and carried on the shank when in an engaged position such that the shank and sleeve together define a size conversion structure for the shackle." (Exhibit 4, pg. 94) This Amendment speaks directly to the function of the sleeve: to provide the shackle with another operative thickness. This Amendment provides evidence supporting Wyers' construction of the '115 Patent. The conversion of the shackle is what allows for greater load bearing at its second operative state and this information, typically understood to a person of ordinary skill in the art, needs to be clarified to the jury to better understand the function of the Patent and its claim terms.

Further, this Amendment includes the abstract paragraph in column 5 ll. 58-column 6 ll. 1-4, to address the issues raised in the Office Action concerning other "nesting" sleeves and shanks. This was done in order to distinguish the '115 Patent and provide further clarification to the claim language and the functionality of the patent and how the sleeve is to be engaged with both the apertures and the shanks in order to provide a second fully functional load bearing hitch at a greater load bearing capacity.

Wyers' construction of the language of claim 23, the "shank having first and second ends" has support in this Amendment as well. Arguing around the prior art asserted against Wyers in the Office Action, Wyers argued that none of the prior art references "remotely show a linear shank having a removable sleeve of common linear length between the stop portion and the latch portion." The construction proposed by Wyers is almost verbatim the language stated in this Amendment arguing against obviousness and is an appropriate construction given the intent of the inventor at the time of prosecution.

### 2. Claim Terms Identified by Cequent for Construction (Claims 23 and 27)

The following chart identifies the terms of claims 23 and 27 of the '115 Patent on which Cequent requests construction, along with the parties' competing claim construction positions:

**Claims 23 & 27 of the '115 Patent**
*(terms identified for construction by Cequent)*

| Claim Term | Wyers' Proposed Construction | Cequent's Proposed Construction |
|---|---|---|
| "locking head member movable between locked and unlocked states" (claim 23)<br><br>"locking head movable between a locked state and an unlocked state" (claim 27) | "locking head member movable between a locked state and an unlocked state"[4] | "an assembly capable of being affixed to the latch portion of the shank so that the insertable end of the shank can no longer be removed from the apertures of the two locked-together objects when in a locked state and is removable from the shank when unlocked" |
| "sleeve" (claims 23 and 27) | "sleeve" | "an encasing piece of material that is capable of being slid on and off the shank" |
| "stop portion" (claims 23 and 27) | "stop portion" | "the part of the shackle/hitch pin that has an enlarged, bent, or looped portion that cannot pass through the bore hole or other aperture of the trailer hitch and vehicle mount" |
| "latch portion" (claims 23 and 27) | "latch portion" | "the part of the shackle/hitch pin that is on the end of the shackle/hitch pin inserted into the borehole that is notched such that the locking head—which is also unable to pass through the hole—will attach securely to the shackle member once locked thereto" |
| "shank" (claims 23 and 27) | "shank" | "the linear portion of the shackle/hitch pin that is inserted into the aligned apertures of the hitch bar and hitch receiver to secure them together" |
| "system" (claim 23) | "system" | "a group of elements that interact and function together as a whole" |

As Cequent has not yet stated any basis for its proposed constructions of the foregoing terms, Wyers preliminary addresses such constructions, and will further respond in its reply brief. The terms that Cequent has identified for construction from

---

[4] As with other terms proposed for construction by Cequent, Wyers seeks no construction aside from the actual claim language on this term. Wyers erroneously included only "locking head" as its proposed construction in the parties' Joint Claim Construction Statement, but makes clear above that it seeks a construction identical to the words of the claim.

claims 23 and 27 are plain on their face. Terms such as "shank", "latch portion" and "sleeve" need no additional construction to be understood by the fact finder. Unlike the terms Wyers proposes for construction, which implicate a set of pre-existing industry requirements defining ordinary and customary meaning, Cequent seeks constructions that would add superfluous verbiage or alter the plain meaning of the claim terms. Such unnecessary additions should be rejected.

### A.   THE '121 PATENT

#### 1.   Claim 5

Wyers seeks construction of a single claim term of claim 5 of the '121 Patent, as reflected below:

**'121 Patent**
*(terms identified for construction by Wyers)*

| Claim Term | Wyers' Proposed Construction | Cequent's Proposed Construction |
|---|---|---|
| "orthogonally" (claim 5) | "in perpendicular orientation thereto" | "oriented at a 90 degree angle" |

Wyers' proposed construction of the term "orthogonally" will assist the fact finder in deciphering the meaning of this uncommon term. The term "orthogonally" is not within the normal vocabulary of the typical juror. The word is synonymous with "perpendicular," a much more commonly used word. Wyers' construction will assist the jury in understanding the meaning of claim 5 of the '121 Patent. Cequent essentially agrees, proposing construction of this term as "a 90 degree angle", or "about a 90 degree angle", which is more cumbersome, but otherwise without significant difference from Wyers' proposed construction.

Cequent seeks constructions which import new limitations into the following terms of claim 5 of the '121:

**'121 Patent**
*(terms identified for construction by Cequent)*

| Claim Term | Wyers' Proposed Construction | Cequent's Proposed Construction |
|---|---|---|
| "longitudinal throughway extending therethrough" (claim 5) | "longitudinal throughway extending therethrough" | "a passageway extending entirely through the lengthwise part of the body portion having openings on opposite sides of the body portion" |
| "a transverse bore intersecting the throughway" (claim 5) | "a transverse bore intersecting the throughway" | "a cavity in the body portion that intersects the longitudinal throughway at a 90 degree angle" |
| "oriented generally orthogonally" (claim 5) | "in perpendicular orientation thereto" | "the ball element intersects both the throughway and the bore at about a 90 degree angle" |
| "tubular casing disposed in the throughway" (claim 5) | "tubular casing disposed in the throughway" | "a hollow tube that is a separate piece from and fits within the longitudinal throughway" |

Cequent's proposed constructions impose limitations in the claim language directly from the preferred embodiment without any support. Claim language is not to be limited by a description of a preferred embodiment, absent clear intent reflected in the patent specification to do so. *See Acumed*, *supra*. The specification of the '121 Patent does not reflect a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction" regarding the preferred embodiment. *See* **Ex. 2**. To the contrary, the Summary of the Invention, in column 3 ll.1-20 the invention is described in broad terms describing the object and function of the invention as it claimed. As the Summary continues, the exemplary embodiment is described only as one possible manifestation of the invention, but there is no limiting language narrowing the invention to the described embodiment. Adopting Cequent's claim

construction position as to claim 5 would run afoul of the principles discussed in *Acumed*—there would be no point to claims of a patent if the invention was constrained to the preferred embodiment. 483 F.3d at 809.

The constructions proposed by Cequent are not only directly derived from the preferred embodiment of the '121 Patent, but they are without any support in the Patent or specification. Cequent's proposed construction narrows the patent even further to specifically require the "tubular casing" to be hollow, and the "longitudinal throughway" to be limited to only a passageway extending entirely through the lengthwise part of the body of the lock. These constructions unnecessarily limit the scope of the Patent to allow for only one embodiment of the patent, the preferred embodiment as defined by Wyers in the '121 Patent.

Further the use of the term "cavity" to describe a "bore" in the Patent is directly contrary to the plain meaning of the term "bore". *See, e.g.*, "cavity" defined as a hallow space comp with "bore" defined as a making a hole, http://dictionary.reference.com. Cequent is unable to provide support in the '121 Patent or its specifications for its constructions, and it is error for the Court to read in any limitations of the preferred embodiment into the claim language. Wyers will respond more fully regarding Cequent's proposed construction after Cequent discloses the claimed support, if any, for its positions in its claim construction brief.

## IV. CONCLUSION

Wyers urges construction of the '115 Patent on ten claim terms, and one term of the '121 Patent. These constructions are essential to allowing the jury to resolve critical

issues of infringement and validity. Wyers' construction of the '115 comes from both intrinsic evidence found in the Patent itself, in the specification, as well as the prosecution history, and is strengthened by extrinsic evidence of what the ordinary person skilled in the art of automotive locks would construe and understand the claim terms to mean at the time of the invention. Failure to construe these terms will leave open questions regarding patent breadth, scope and functionality contrary to the Supreme Court's ruling in *Markman*. Wyers' proposed construction for the '121 Patent simply is re-stating the plain meaning of the term for ease of the jury's understanding. However, Cequent is attempting to violate the law of claim construction and read limitations into the claims taken directly from the preferred embodiment. For the forgoing reasons, Wyers urges that the court adopt its constructions of the following terms, and apply the pain meaning of those terms identified by Cequent.

| *Claim Term of the '115* | *Wyers' Proposed Construction* |
|---|---|
| "first hitch bar and a first hitch receiver" (claim 23) | "Class II hitch bar and a Class II hitch receiver capable of towing at least 5000 lbs when properly assembled" |
| "first apertures of a first size" (claim 23) | "holes in the Class II hitch bar and Class II hitch receiver having approximately a ½ inch diameter" |
| "aligned for registration" (claim 23) | "when the Class II hitch bar is inserted into the Class II hitch receiver, the first apertures register to allow insertion of the shank of the convertible hitch pin" |
| "second hitch bar and second hitch receiver" (claim 23) | "Class III/IV hitch bar and Class III/IV hitch receiver capable of towing at least 10,000 lbs when assembled" |
| "second apertures of a first size" (claim 23) | "holes in the Class III/IV hitch bar and Class III/IV hitch receiver having approximately a ¾ inch diameter" |
| "shank having first and second ends" (claim 23) | "the portion of the locking pin that sits between the end portion and the locking head" |
| "outer dimension sized and adapted for close-fitted engagement with the first apertures" (claim 23) | "outer diameter of the shank is manufactured to engage (through close proximity) the apertures of the Class II hitch bar and Class II hitch receiver for purposes of completing the system that tows at least 5000 lbs and sheer load of at least 15,000 lbs" |
| "selective engagement with said hitch pin shank" (claim 23) | "a sleeve that engages the shank by having an interior diameter that closely approximates the exterior diameter of the shank for purposes of ensuring that the combined shank and sleeve can tow at least 10,000 lbs and sustains more than 25,000 lbs in sheer load" |

| Claim Term of the '115 | Wyers' Proposed Construction |
|---|---|
| "an outer dimension sized and adapted for close-fitted engagement with the second apertures" (claim 23) | "outer diameter of the sleeve is manufactured to engage (through close proximity) the apertures of the Class III/IV hitch bar and Class III/IV hitch receiver for purposes of completing the system that tows 10,000 lbs and sustains more than 25,000 lbs of sheer load" |
| "orthogonally" (claim 5) | "in perpendicular orientation thereto" |

Respectfully submitted this 11th day of November, 2013.

LATHROP & GAGE, LLP

By: *s/ Jessie L. Pellant*
Aaron P. Bradford
Alexander C. Clayden
Jessie L. Pellant
950 17th Street, Suite 2400
Denver, Colorado 80202
720.931.3200
abradford@lathropgage.com
aclayden@lathropgage.com
jpellant@lathropgage.com

*Attorneys for Plaintiffs Philip W. Wyers and Wyers Products Group, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify on this 11th day of November, 2013, a true and correct copy of the foregoing **PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF** was filed via CM/ECF with a copy served electronically upon:

David B. Cupar
Matthew J. Cavanagh
600 Superior Avenue East, Suite 2100
Cleveland, Ohio 44114
dcupar@mcdonaldhopkins.com
mcavanagh@mcdonaldhopkins.com

Andrew J. Petrie
Featherstone Petrie DeSisto LLP
600 17th Street, Suite 2400 S
Denver, Colorado 80202
apetrie@featherstonelaw.com

LATHROP & GAGE, LLP

By:   *s/ Jessie L. Pellant*
Aaron P. Bradford
Alexander C. Clayden
Jessie L. Pellant
950 17th Street, Suite 2400
Denver, Colorado 80202
720.931.3200
abradford@lathropgage.com
aclayden@lathropgage.com
jpellant@lathropgage.com

*Attorneys for Plaintiffs Philip W. Wyers and Wyers Products Group, Inc.*